IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DASHAWN JAMISON,
    Plaintiff,
    v.
JACK MOTTIN, DAVID RAMBEAU, and
TIMOTHY CRYTZER,
    Defendants

Case No. 3:11-cv-98-KRG-KAP

## Order, Report and Recommendation

### Order and Recommendation

Pending is the remaining defendants' motion for summary judgment, docket no. 81. It should be granted for the reasons explained below. The plaintiff's motions at docket no. 90 and docket no. 92 are denied for the reasons explained below. The motion contained in the pleading at docket no. 93 styled "Notice" is denied as moot.

### Report

At the time he filed the complaint, plaintiff Dashawn Jamison was serving a 5½-11 year sentence imposed on November 1, 2006, by the Court of Common Pleas of York County. He was 16 when sentenced, and after classification at S.C.I. Camp Hill was assigned to the facility for youthful offenders sentenced as adults at S.C.I. Pine Grove. Jamison was there from February 7, 2007 to June 16 (according to defendants) or June 18 (according to plaintiff), 2009, after which he was transferred to S.C.I. Coal Township and eventually to S.C.I. Houtzdale. At Houtzdale in April 2011, Jamison filed a complaint, docket no. 4, against employees of the Pennsylvania Department of Corrections alleging improper

disciplinary procedures against him in April 2009 and May 2009, and an improper use of force against him on June 9, 2009, by defendant corrections officers David Rambeau and Timothy Crytzer under the supervision of defendant corrections officer Jack Mottin. I screened the complaint under 28 U.S.C.§ 1915A and recommended that the first two thirds of the complaint be dismissed for failure to state a claim on which relief can be granted, and that the excessive force claim against Crytzer, Rambeau, and Mottin go forward. I gave Jamison leave to amend his complaint. docket no. 3. Jamison filed an amended complaint, docket no. 9, which for some reason was served on all the defendants named. The defendants filed a motion to dismiss, docket no. 54, and plaintiff, now in the Special Management Unit at Camp Hill, asked for an extension of time to December 9, 2011, to reply to the motion to dismiss, docket no. 56, and then asked for an extension until defendants provided him with copies of the cases cited in their brief, docket no. 58, and then an implicit request for an extension of time in a request for a copy of the record because corrections officers at Camp Hill allegedly had destroyed or taken all of his legal work during a cell search on January 18, 2012.

I submitted an Report and Recommendation in March 2012, docket no. 61, referring back to my previous Report and Recommendation, recommending that the excessive force claim go forward and the balance of the complaint be dismissed. On or about

the time objections were due Jamison filed a response to the motion to dismiss, docket no. 62, docket no. 63, that the Court reviewed as objections to the Report and Recommendation. After an independent review of the record the Court ordered most of the amended complaint dismissed without further leave to amend and agreed the excessive force claim could go forward. docket no. 65.

I had issued a discovery schedule with my Report and Recommendation, and extended it at plaintiff's request in August 2012, docket no. 72, requiring the parties to wrap up discovery by the end of 2012 and then file summary judgment motions in January 2013. My case management order provided that motions for summary judgment were not optional, and required each party to reply to the other's motion for summary judgment within 20 days. docket no. 73. Defendants, after requesting an extension of time to February 2013, filed the pending motion at docket no. 81, with evidentiary material (the declarations of the corrections officers allegedly involved in the use of excessive force) at docket no. 84. Plaintiff notified the Court that he would not be filing a motion for summary judgment. docket no. 79. In March, plaintiff filed a motion from the Northumberland County Prison where he was awaiting trial on new charges, docket no. 86, seeking additional time to respond to the defendants' motion for summary judgment. I granted that motion to May 20, 2013. docket no. 87.

Instead of a response, in May 2013 Jamison filed a Motion for Communication, docket no. 90, with a brief, docket no. 91, asserting that he needed to communicate with four inmates or former inmates (Brown, Rochester, Santana, and Shackelford) to prepare his response to defendants' motion for summary judgment. Jamison had previously in November 2012 filed a similar motion naming five inmates (Brown, Rochester, Mailen, Slaughter, and Martin) and giving no details. docket no. 76. In December 2012 I had denied that earlier motion without prejudice to refiling it with more specifics about why communication with those inmates was necessary. docket no. 77. The new motion related that each had evidence relevant to Jamison's case, but otherwise was equally vague. One of Jamison's misconducts, it is worth noting, involved attempts to have unauthorized communications with inmates in the prison system.

Jamison filed a simultaneous motion to extend the time to respond to the defendants' motion until his motion for communication with the two new and two old inmates had been granted and he had completed discovery. docket no. 92. Discovery of course had closed five months earlier.

Summary judgment should be granted to the defendants because even accepting plaintiff's version of the facts (but discounting his conclusions) the defendants' use of force was *de minimis*. Plaintiff's account of the defendants' use of force, taken from his various motions, his amended complaint and the

exhibits to his original complaint, is that on June 9, 2009, there was a general search of the cells on Jamison's block by a score or more of corrections officers, dressed all in black to be intimidating, and yelling, banging, and being aggressive. Mottin was in charge of Jamison's pod, and Rambeau and Crytzer ordered Jamison to strip naked, be searched, then put on a pair of boxer shorts and exit his cell. Crytzer ordered Jamison to take his hair out of braids and Jamison informed the corrections officers that "it would take a long time." Rambeau stated that this was a refusal and that Jamison must "cuff up." Jamison replied that he was not refusing and that his intention was only to inform them that it would take a long time. At this point Mottin ordered Crytzer and Rambeau "put his ass on the floor and rip it out yourselves." Rambeau and Crytzer each took one of Jamison's combs and began "to violently pull [Jamison's] hair out with the mere intention to cause me pain and torture me" while making racial slurs about Jamison. This went on for 10-15 minutes or longer. According to Jamison, this left his head "bloody."

The Supreme Court's explanation of the Eighth Amendment's restrictions on use of force to maintain or restore discipline in a prison environment begins with <u>Whitley v. Albers</u>, 475 U.S. 312 (1986), in which Gerald Albers was deliberately shot in the left knee by a corrections officer armed with a shotgun during an attempt to rescue a corrections officer who had been taken hostage.

Assuming, as the Supreme Court did, that the shooting was unnecessary, and even though the evidence was that Albers had not been involved in the riot and indeed had attempted to help resolve matters, his actions in climbing stairs toward his cell were "equivocal conduct" that the officer with the shotgun may have thought, incorrectly, constituted a threat to the hostage. 475 U.S. at 324-26. The Supreme Court quoted <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir.) <u>cert. denied</u>, 414 U.S. 1033 (1973) for the language establishing the Eighth Amendment standard for prison security measures used to maintain or restore order: liability turns on whether force is applied in good faith or "maliciously and sadistically for the very purpose of causing harm." 475 U.S. at 320-21. <u>See also</u> <u>Smith v. Mensinger</u>, 293 F.3d 641, 648-49 (3d Cir.2002), <u>quoting</u> <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir.2000)(factors to be considered include the need for use of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the threat to staff and other inmates perceived by the corrections officers, and any efforts made to temper the severity of the force used).

The significant difference between Jamison's account at the time and his claims years later in this litigation relate to his complaint that his head was "bloody" as a result of Crytzer and Rambeau's actions. Jamison's contemporary accounts of the event are in his grievances, filed as exhibits to his original complaint.

6

On June 9, 2009, Jamison filed at least two administrative remedy forms: an appeal from a disciplinary hearing in which he had been found guilty, and grievance #276590, complaining about the cell search. In the initial grievance Jamison stated that Rambeau and Crytzer "violently" used his combs and that Rambeau had spit on one of them when he was done. He complained about no injuries, and spent about half of the grievance complaining about magazines that had been thrown away. docket no. 4 at 31-32. Jamison's grievance appeal complains that Crytzer and Rambeau "disrespected me in every way they could," docket no. 4 at 39, but again complains of no injury; Jamison's accompanying letter, docket no. 4 at 41, states that the officers went "back and forth" in his hair, that Jamison informed them "that the way they were trying to get my hair out was not the right way it is supposed to be done and that they were hurting me" and that at one point Jamison "yelled out of pain" during the event. After the search, according to Jamison, he threatened to file a grievance and the officers responded by threatening to issue a misconduct for refusing to obey an order, and Jamison replied "you know what, it's not that big of a deal." Id. Jamison then went on to complain about the loss of his magazines.

It is not in dispute that Jamison did not seek medical treatment at Pine Grove then or for the rest of his stay there. Nor is there any claim that he sought, much less needed, medical

7

treatment for any injury while at Coal Township, Houtzdale, or Northumberland County Prison.

In <u>Reyes v. Chinnici</u>, 54 Fed.Appx. 44, 48 (3d Cir.2002), a panel of the Court of Appeals affirmed summary judgment in favor of a corrections officer after assuming that a jury could have found the officer punched a handcuffed prisoner and after noting that all three corrections officers deposed had opined that punching a handcuffed inmate can never be an acceptable use of force. The court observed that even inappropriate uses of force must rise "to the level of a constitutional dimension" and:

> There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically.

<u>Reyes v. Chinnici</u>, 54 Fed.Appx. 44, 48 (3d Cir.2002).

Disregarding defendants' accounts entirely and accepting Jamison's account entirely, the actions of Crytzer and Rambeau were undertaken during an unquestionably legitimate cell search and after Jamison had given what at best was an "equivocal," <u>Whitley v. Albers</u>, 475 U.S. at 325, reply that had the effect of thwarting the corrections officers' attempt to carry out a speedy and thorough search. At worst, and Jamison does not indicate why given the disciplinary record he includes with his complaint the defendants should not have expected the worst, Jamison was openly defiant of an order, and he was openly defiant of an order in the midst of other inmates who could reasonably thought to be observing

8

how corrections officers would handle his defiance. As for the officers' response and their "tempering" their response, Jamison himself relates that the officers lowered (not tackled) him to the ground, and (although their alleged use of language was not appropriate) their actions were consistent with their stated intention, to search his hair, and not with torture. The defendants' use of force can, except in the characterization Jamison gives it for purposes of litigation, hardly be called a use of force. By his own account, Jamison alleges that during the use of force he could talk to the officers with enough presence of mind to critique their performance. So little force was used that immediately afterward Jamison, again by his own account, could banter about trading grievances for misconducts. Jamison never even sought medical treatment.

Allegations of unprovoked assaults, <u>Wilkins v. Gaddy</u>, 559 U.S. 34 (2010)(Wilkins asked corrections officer Gaddy for a grievance form and Gaddy punched, kicked, kneed, and choked Wilkins) and retaliatory beatings, <u>Smith v. Mensinger</u>, 293 F.3d 641 (3d Cir.2002)(inmate's head rammed into walls and cabinets, then inmate kicked, punched, and choked) are one thing. Instances of use of force that someone may in hindsight judge to have been greater than strictly necessary or even inappropriate are another. See <u>Carson v. Mulvihill</u>, 488 Fed. Appx. 554 (3d Cir.2012)(affirming summary judgment to corrections officer who "launched" a

wheelchair-bound inmate into a steel bunk to return him to his cell). The evidence in this matter falls so far short of creating a genuine issue of material fact as to the use of force that summary judgment must be entered for the defendants.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

DATE: July 5, 2013

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

Dashawn Jamison GW-6262
S.C.I. Camp Hill
P.O. Box 200
Camp Hill, PA 17001-0200